IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAVAREE Q. BULLOCK,                      )
                                         )
            Petitioner,                  )      No. C 06-3548 CRB (PR)
                                         )
      vs.                                )      ORDER DENYING PETITION
                                         )      FOR A WRIT OF HABEAS
JAMES YATES, Warden,                     )      CORPUS
                                         )
            Respondent.                  )
_____ )

        Petitioner was convicted by a jury in the Superior Court of the State of

California in and for the County of Alameda of second degree robbery and

possession of a firearm by a felon.  The court found that he had suffered one prior

serious felony "strike" conviction.  On August 24, 2004, petitioner was sentenced

to a 21-year state prison term.

        The California Court of Appeal affirmed the judgment of conviction on

January 19, 2006, and, on March 29, 2006, the Supreme Court of California

denied review.  Petitioner then filed the instant petition for a writ of habeas

corpus under 28 U.S.C. § 2254 challenging the prosecutor's use of peremptory

challenges against African-American jurors based on Batson v. Kentucky, 476

U.S. 79 (1986).  Per order filed on June 2, 2006, the court found that the petition,

when liberally construed, stated cognizable claims under § 2254 and ordered

respondent to show cause why a writ of habeas corpus should not be granted.

Respondent has filed an answer to the order to show cause and petitioner has

filed a traverse.

# FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

Bullock's counsel, Michael Dinning, raised four <u>Wheeler</u> objections, which case law treats as preserving <u>Batson</u> objections as well (<u>People v. Yeoman</u> (2003) 31 Cal.4th 93, 117-118). Each was overruled. We review the pertinent voir dire proceedings.

**First motion**. The first objection came after prosecutor Maya Ynostroza's third peremptory challenge, the last two being against Black jurors K.F. and S.G. Dinning (joined by codefendant's counsel) asked that the panel be stricken, saying: "I don't think there was anything wrong with either of those persons sitting as jurors in this case, and I think that the prosecution has a burden now of explaining why Ms. [S.G.] and why Mr. F[.] were not acceptable." The court confirmed the jurors' ethnicity and said: "A ruling on a Wheeler motion is not simply a matter of counting, however, and while I recognize what the numbers are, I do not consider that there is a prima facie showing of systematic exclusion of Blacks, and I'll tell you why I'm making that determination. I'm not blind, and I'm not–and I don't make a determination by turning a blind eye toward what I've seen and heard."

The court then recited its own observations about reasons for striking the jurors[1] and ruled: "[S]o I do not find, at this point, based

---

[1]

"Mr. F[.], I expected he was not going to end up on this jury, and I wouldn't have blamed any of the three of you for excusing him, given his attitude about attorneys, as well as his–even though [he] denied it, I got this feeling he had some serious misgivings about the judicial system as a whole, and it may have been all caught up in the fact that attorneys are involved, whether it's a criminal cases or civil cases [ sic ], but I also felt that getting information out of him was like pulling teeth to some information, and I felt that he wasn't being entirely forthright in his feelings, his attitudes, and any potential biases, but–and I took particular note of his attitude about attorneys.

"As to Ms. [S.G.], . . . I saw something that doesn't show up in a record. It wouldn't show up in a transcript, particularly when Ms. Ynostroza was talking to her. There was an attitude. It's interesting. She's an employee of the court working down at the Wiley W. Emanuel Courthouse, but she was dripping with attitude, as far as I'm concerned. Particularly when Ms. Ynostroza was questioning her. Not only when Ms. Ynostroza was questioning her, but that I was particularly struck

upon this showing, that there is a prima facie showing of systematic exclusion, and I, therefore, do not feel it necessary to call upon the People to justify that which I don't think is illegal, at this point. I will—Ms. Ynostroza, if you'd like an opportunity to be heard on your reasons, I'll be happy to give you that opportunity, but I'm not going to require it." Ynostroza responded, "I think, essentially, the court articulated what I was prepared to articulate had the court found a prima facie case, so I'm satisfied with the court's record."

**Second motion**. Dinning moved again to discharge the panel after Ynostroza had exercised her twelfth challenge in all, including two more against Black jurors–Ms. L.G. and Mr. J.G. The court said it was "extremely puzzled" by the challenge to Mr. J.G. It felt that a prima facie case was shown and asked Ynostroza to explain "all four."

Ynostroza reinforced the court's earlier observations as to the first two (fn.1, ante ), and no appeal argument attacks those particular justifications. Mr. K.F., she said, had expressed "strong feelings about" and "didn't like" attorneys, was not "forthcoming" with information, and had a brother-in-law who had served time in Tennessee for a drug offense because, K.F. felt, "he didn't turn someone else in" and was " 'at the wrong place, at the wrong time.' " Ms. S.G. was familiar to Ynostroza from S.G.'s job at "the criminal counter" at the Wiley W. Manuel Courthouse. Ynostroza did not think S.G. recognized her but "felt hostility from her" and that she "wasn't looking at me in a pleasant way." Ynostroza felt this "some" in S.G.'s interactions with other counsel, too, and felt that she was not "taking well to being here in the first place"; it felt "personal," and Ynostroza was uncomfortable with S.G.'s ability "to be objective and listen to evidence" in a case where Ynostroza had the burden of proof.

Ms. L.G., Ynostroza felt, seemed "honest and up-front" at first, despite having a cousin convicted for auto theft, but "her body language changed" after the court denied her a hardship excuse sought for employment due to a husband's disability. Her "[a]rms crossed to the side of her," and Ynostroza did not feel she would listen to the evidence, work with other jurors, or give the case the attention both sides needed.

Mr. J.G. had "been sitting in the box for quite a while. . . . He looked at me a number of times, and made me uncomfortable. Not only did I watch, specifically, when certain jurors, who were being honest about their difficulty in being fair and impartial, particularly Ms. F[.], who's seated number one, when she was talking about the stop light–the red light/green light hypothetical with a police officer

with that, and for that reason, again, I had a strong feeling that she was going to be-that there was going to be a peremptory challenge directed at her, which I understand, and I take that into account."

3

and civilian witness–he looked over and appeared to be very annoyed and frustrated with the responses that she was giving. I felt she was being honest, and she was informing us all of her position and her feelings, based on her life experiences, having grown up in Ohio, and her belief that law enforcement is a good thing.  Then, also, when Ms. S[.] was speaking–with both prospective jurors–Mr. [J.G.] leaned forward and had a very–I thought–disdainful reaction on his face, when they were providing the court and the attorneys with, just their personal beliefs and opinions, based on the questions that were being asked of them. And someone who responds in that way makes me think that this is a situation where, possibly, he could be someone who would dig his heels in, and would not at least listen to other people's opinions, were it to come to the deliberation process. And it did not make me feel comfortable that this was going to be someone who would be able to work with other people, based on his reaction to responses which I felt were genuine responses. I didn't feel that either of those two women were particularly trying to get out of serving as jurors, but they were providing their responses."

The court then invited comment from Dinning, who said he wanted to "lightly touch on" Mr. K.F. and Ms. S.G., as to whom the court had "already made certain factual findings" (on the prior motion). "To the utmost extent," Dinning said, he did "not share" the court's concerns about "attitude dripping from" Ms. S.G. or any concerns about Mr. K.F. What the court construed as "difficulty" in eliciting information, Dinning felt, was just a serious attempt to respond honestly and fairly to each question. Turning to the newly struck jurors, Dinning said he was "just overwhelmed" with Mr. J.G. and began to state the juror's experiences. "Forgive me for interrupting," the court interjected: "I know everything he said, and the record will reflect that, but [Ynostroza's] comments about Mr. [J.G.] had nothing to do with the answers that he gave. Her reasons–it was more her observations of his demeanor and reaction to certain other prospective jurors after we talked to them. So I don't think we need to focus on that so much. I agree with you that there's nothing in what he said which I could point to as a reason for excluding him from this jury, but what I would like you to do is direct your comments to her justification, because she's not claiming there's anything in what he said, either."

So focused, Dinning went on to say he did not think that the juror's demeanor was inappropriate and saw nothing unusual in the juror's reaction to the way in which another juror had behaved in "obviously and transparently" trying to "get herself off the jury ." He could not "feel more confident" in Mr. [J.G.'s] ability to be fair and felt that striking him was for improper purposes. Invited by the court to add comments, codefendant's counsel Stephen Naratil said that he heard "sighs in the back" upon the striking and had himself "raised [his] eyebrows." As for the juror who was challenged after her hardship excuse was denied, Naratil felt she "was probably disappointed," and he had not noticed anything out of the ordinary. Conceding that he did not look at the jurors "all the time," Naratil

4

"certainly didn't see any type of strange looks that the court saw, or any type of looks dripping with [attitude]." Mr. K.F., he thought, had been "thoughtful in his responses, not trying to evade responses."

The court denied the motion, explaining as to Ms. S.G. that the prosecutor's term " 'hostility' " better described her than the court's term " 'attitude.' " Next, the court related the same concern about a change of attitude, or "indifference," in Ms. L.G. once that juror's belated request for hardship excuse had been denied, adding: "And I didn't make any comment about it at the time the motion was made here, because I wasn't going to feed that to the district attorney. I wanted to see what she had to say, but it's interesting she made the same observation that I did. And I think that that is a legitimate concern on the part of the district attorney, who has to convince all twelve people."

Finally, the court reiterated as to Mr. J.G. that the prosecutor's concern had not been with anything J.G. answered, but with J.G.'s "reactions, as perceived by her, to other prospective jurors. I didn't make those observations," the court stressed, "but I wasn't paying attention to [J.G.]. I was focused on the people that were being questioned at the time, so I'm just not in a position to be able to make any comment on that, firsthand. I think that those are–if [Ynostroza] made those observations, that's a legitimate basis for having a concern. I accept Ms. Ynostroza's good faith representation that those are the observations she made. I can't observe everything that goes on in that jury box, and so I think I have to, as long as I feel that the–that that was an honest, good faith description of what she saw, I do accept that."

The court closed: "And I'd also note that the issue here is whether there's been a systematic exclusion on the basis of race, and with regard to the first three . . . my own observations tell me that there are legitimate reasons, as articulated by Ms. Ynostroza, for excusing them, which leaves Mr. [J.G.] as the only person regarding whom I made no personal observations. But I would not–I don't think it's necessarily appropriate to find systematic exclusion based on excusing one person, whereas there are three other people that I can see very legitimate reasons for. I'm saying this, in addition to accepting Ms. Ynostroza's remarks in [ sic ] being made honestly and in good faith, so for the reasons articulated, the motion is denied."[2]

---

[2]

The court having stated its ruling twice, with detailed reasons, codefendant's counsel Mr. Naratil, who had joined in the objection, pressed, "Does the court find it odd, out of the six-" but was cut short by the court saying: "I just made a ruling, and after I make the ruling, I don't need-I don't particularly want to get into a dialogue or debate about whether it was a correct ruling. It's kind of the one you're stuck with, but

**Third motion**. Dinning objected again when Ynostroza peremptorily challenged a fifth Black juror, Mr. A.F., and the matter was taken up the next morning, codefendant again joining the motion. The court asked for an explanation, and Ynostroza, noting as she had the last time that there were two Black jurors remaining in the box,[3] cited first the fact that when the court remarked that it had a college roommate with the juror's unusual first name and thus knew how to pronounce it, the juror gave a "humorless," "deadpan" response of, "I go by Quen," which did not at all resemble the given name. Ynostroza added that, when seated in the box, A.F. was unusually nervous and uncomfortable. He was either nervous "or totally indifferent," she thought, had an extremely low, quiet voice that was hard to hear, gave responses that were "minimal, at best," and lacked any sort of "human expression." Ynostroza's initial impression of him as a loner grew stronger with the questioning, and she had "a real concern," based on his demeanor, that he would have trouble interacting with others. She feared that he could not make his opinions known or relate to others, and she had earlier excused a White male juror for similar reasons.

The court responded, first, by finding the humorless response to the name remark not "that bizarre" in that "Quen" was the start of the man's middle name, which he would understandably use given his unusual first name. The court did, however, agree with the observations of demeanor: "My read on him was he stutters. And people who will stutter oftentimes tend to withdraw. They're embarrassed. And so the way he conducted himself, in my mind, was consistent with that"–stuttering that left him "a bit of a loner. . . . So in certain respects, I agree with you. In other respects, I don't necessarily agree with you. But if your major concern was for whatever reason he appears to be a loner, who may not relate well to other people, I consider that . . . a reason for excusing him to which this court should properly defer, because it's not an invalid reason. It's not necessarily an unreasonable reason, and I do recognize your need to convince twelve people unanimously. So it seems to me, the ability to relate to the other jurors would be a legitimate concern, and, actually, the record should reflect that he does stutter or stammer." Ynostroza said she had noticed the stuttering but not mentioned it, unsure whether it was a medical condition or just brought on by nerves. The court said: "Well, that was my read, but–and I think that has to do with the way he conducted himself, and I don't think your description of how he conducted himself is really inaccurate. It's consistent with what I saw and just can see

if I did wrong, you've got a record."

[3] The court both times deemed unchallenged Blacks "irrelevant," saying the first time this was "[b]ecause we're not done with jury selection," and the second time, that "it sound[ed] like tokenism."

6

possible a reason for it, but I think that I accept your explanation. I don't find it to be unreasonable, based upon my observations of Mr. [A.F.], and, for that reason, the so-called <u>Wheeler</u> motion will be denied."

Each defense counsel then offered views which the court indicated, in essence, were unhelpful or had already been assumed and considered.[4]

---

[4]

"Mr. Dinning: Your Honor, do I have any chance at all to respond to the characterizations?

"The Court: Well, you know, I got to say, I thought about that, and–and I'm basing this upon what she said and my observations, and I don't think it's necessary for you to respond.

"The question for me is is, do I believe that that's a good–that she's representing a good faith or actual reasons and are they supported–well, they don't have to necessarily be, but are they supported by either responses to questions or my own observations? And you can make all the arguments that you want, but I believe that they are, and I'm not–my job is not to decide whether this is a person that she should excuse. My job is simply to decide whether her motivation for excusing this man, or any of the African-Americans, and I heard her justification for the others, so I didn't need to inquire again: Was it racially motivated? And I believe I accept her race-neutral explanation, and I don't think comments by defense counsel are going to add or take away from that, because they don't change what I heard, what I saw, and they don't change what's going through the district attorney's mind.

"Mr. Dinning: Well, I would like the record to reflect, Your Honor, that I view this third occasion, upon which we've been compelled to bring a <u>Wheeler</u> motion in this action, based upon now a fifth strike of an African-American juror, to be a constitutional dimension, and I feel, moreover-

"The Court: Counsel, wait, wait. I don't need that, because I know that. To make the motion is a shorthand way for articulating all of that. It's all based on notions of due process and a fair trial. I thought that what you wanted to respond to were what her actual comments were, and what you're arguing I don't need. I know all that. I know that's why you're making the motion, and your outrage is not going to change my ruling. That's my ruling."

7

**Fourth motion**. The final motion, again joined by codefendant, came when Ynostroza exercised a sixth peremptory challenge against a Black juror, this time Ms. E.L., one she had first tried unsuccessfully to challenge for cause.

The court this time did not require Ynostroza to justify the action because it did "not find that there's a prima facie showing of systematic exclusion" and felt it was "pretty obvious why any district attorney would excuse Ms. [E.L.]. Not only does she characterize her son as being constantly harassed by the police because he's an African-American male." E.L. had also "expressed a rather strong–although not absolute unwillingness to accept as true what police officers say, and . . . any district attorney would be reasonably justified in not wishing to take a chance on leaving a juror of that frame of mind on the jury, particularly where she goes so far as to point out that at least one of the defendants, as she puts it, 'favors her son.' In other words, [he] makes her think of her son, visually, which gives rise to also a concern about potential sympathy. For those reasons, I'm not going to ask–I don't think it's necessary to ask the district attorney to justify excusing that juror, and the record reflects all the things that I've just articulated [as] contained in her answers. So the so-called Wheeler motion is denied." Neither defense counsel offered or asked to speak.

People v. Bullock, No. A107667, slip op. at 1-9 (Cal. Ct. App. Jan. 19, 2006) (footnotes in original) (Pet. Ex. D).

## DISCUSSION

A.    Standard of Review

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than

8

[the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

B.     Claims

Petitioner claims that the trial court erred in denying his four "Batson/Wheeler motions."[5] He specifically claims that the court: (1) used the

---

[5]In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion. See People v. Wheeler, 22 Cal. 3d 258, 280 (1978). After Batson, these motions have been commonly referred to in the California courts as

9

wrong standard in ruling on his motions; (2) did not permit defense counsel to present argument after the prosecutor provided reasons for excusing two of the jurors; and (3) failed to make a sincere and reasoned evaluation of the prosecutor's stated reasons, and thereby deprived him of his right to equal protection under <u>Batson v Kentucky</u>, 476 U.S. 79 (1986).[6]

The Equal Protection Clause forbids the exclusion of jurors by peremptory challenge solely on account of their race.  <u>Batson</u>, 476 U.S. at 89.  <u>Batson</u> permits prompt rulings on objections to peremptory challenges under a three-step process.  First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  <u>Id.</u> at 96-97. That is, the defendant must demonstrate that the facts and the circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race.  <u>Id.</u> at 96.  If the defendant makes this showing, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  <u>Id.</u> at 97.[7]  Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.  <u>Id.</u> at 98.  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and determine whether there was intentional discrimination.  <u>Lewis v. Lewis</u>, 321 F3d 824, 831 (9th Cir 2003).

The findings of the state trial court on the issue of discriminatory intent

─────────────────────

"<u>Batson/Wheeler</u> motions."

[6]Petitioner also claims that the AEDPA "unconstitutionally infringes upon the role of federal courts."  This claim has been soundly rejected by the Ninth Circuit.  <u>See</u> <u>Crater v. Galaza</u>, No. 05-17027, slip op. 8135, 8140-55 (9th Cir. July 9, 2007).

[7]During step two, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.  <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991).

10

are findings of fact entitled to the presumption of correctness in federal habeas review.  See Purkett v. Elem, 514 U.S. 765, 769 (1995).  So are the findings of the state appellate court.  See Mitleider v. Hall, 391 F.3d 1039, 1050 (9th Cir. 2004); Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this means that a state court's findings on discriminatory intent are presumed sound unless the petitioner rebuts the presumption by clear and convincing evidence.  Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (citing 28 U.S.C. § 2254(e)(1)).  The petitioner must show the state court's conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Id. (citing 28 U.S.C. § 2254(d)(2)).  Therefore, a federal habeas court can only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge."  Rice v. Collins, 126 S. Ct. 969, 974 (2006).[8]  The standard is demanding, but not insatiable.  Miller-El, 545 U.S. at 240.

### 1.   Standard of Review

The trial court used the term "systematic exclusion" in explaining its reasoning for its ruling on three of petitioner's four motions.  With regards to the first motion, the court stated: "I do not consider that there is a prima facie showing of systematic exclusion of Blacks."  As a result, the court did not require the prosecutor to provide a race neutral explanation of its two challenges.

---

[8]In reversing Collins v. Rice, 348 F.3d 1082 (9th Cir. 2003), the Supreme Court determined that the Ninth Circuit improperly substituted its evaluation of the record for that of the state trial court.  See Rice, 126 S. Ct. at 973.  "Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."  Id. at 975-76 (holding the Ninth Circuit's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus).

However, upon the second motion, the court did find a prima facie case of discrimination for the first two strikes and did require the prosecutor to provide a race neutral explanation, thus negating any error in not finding a prima facie case earlier.  In ruling on the second motion, the court accepted the prosecutor's race neutral explanation for striking one of the jurors, stating that it did not find "systematic exclusion."  Finally, in ruling on the fourth motion, the court once again found that petitioner had not made a prima facie case of discrimination because petitioner had not shown evidence of "systematic exclusion."

Petitioner claims that the trial court's use of the term "systematic exclusion" constituted reversible error.  The California Court of Appeal rejected his contention stating:

> The court repeatedly used the term "systematic exclusion" rather than "purposeful racial discrimination," and Bullock sees this as prejudicial error. We do not. We agree that "systematic exclusion" applies in the context of motions to quash a venire for selection procedures that assertedly result in systematic exclusion of a class of jurors in violation of the constitutional fair-cross-section requirement ( People v. Burgener (2003) 29 Cal.4th 833, 855-858), and is a misnomer in the Batson/Wheeler context, where the challenge is to a panel for asserted racial discrimination in the use of strikes (see People v. Ramos (1997) 15 Cal.4th 1133, 1152, fn. 1 [defining venire and panel ] ). But the main concern is that the word "systematic" might be misconstrued to vitiate settled law that the unconstitutional exclusion of even one juror on improper grounds of racial or group bias requires court action ( People v. Reynoso (2003) 31 Cal.4th 903, 927, fn. 8), and we find no support for Bullock's concern that such misconstruction permeated the rulings here.

> Our state high court has noted the stubborn persistence of the term "systematic exclusion" in Batson/Wheeler rulings, long ago calling it inapposite ( People v. Fuentes (1991) 54 Cal.3d 707, 716, fn. 4) and recently calling it "somewhat of a misnomer," yet not faulting its use when "this and other courts have used and understood that term as an acceptable shorthand phrase for denoting Wheeler error" and, in that case, declining to conclude from its use "that a wrong standard was applied" ( People v. Reynoso, supra, 31 Cal.4th at p. 927, fn. 8; but see id. at pp. 933-934 (dis. opn. by Kennard, J.)).

> The record does not, as Bullock maintains, show any misunderstanding that the prosecutor had to "systematically" exclude Blacks–i.e., leave none in the box or have unconstitutional motives

12

for every strike–to warrant <u>Batson/Wheeler</u> relief. Bullock relies on the court's remarks in the second ruling that it had not made the same "personal observations" Ynostroza had and did not "think it's necessarily appropriate to find systematic exclusion based on excusing one person, whereas there are three other people that I can see very legitimate reasons for." The court, however, was not referring to a need for the prosecutor to strike every Black juror or have improper motives for all of them. Rather, the context (set forth earlier in this opinion) shows the court saying only that, while it had not personally observed one juror's demeanor (occurring while other jurors were being questioned), it had seen such conduct in three others and, partly for that reason, felt that the prosecutor was telling the truth about what she saw in the fourth. The very next words out of the court's mouth confirm this: "I'm saying this, in addition to accepting Ms. Ynostroza's remarks [as] being made honestly and in good faith." So do these preceding remarks: "I can't observe everything that goes on in that jury box, and so I think I have to, as long as I feel that the–that that was an honest, good faith description of what she saw, I do accept that." Further confirming lack of any misconception that all Black jurors had to be stricken are the court's statements, in the second and third rulings, that it deemed the existence of Black jurors left in the box "irrelevant." The notion that unstricken Black jurors were entirely "irrelevant" to discerning racial discrimination was a dubious one ( <u>People v. Turner</u> (1994) 8 Cal.4th 137, 168 [passed jurors considered]; <u>People v. Gray</u> (2001) 87 Cal.App.4th 781, 787 [passed group members a factor, though not conclusive] ) but does in this instance serve to negate the possibility of any erroneous thinking about the term "systematic exclusion."

<u>People v. Bullock</u>, slip op. at 10-11.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent, nor was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

Petitioner argues that the state court of appeals improperly relied on <u>Reynoso</u> because in that case the lower court only used the term "systematic exclusion" once rather than repeatedly.  See <u>People v. Reynoso</u>, 31 Cal. 4th 903, 927 (2003).  The issue, however, is not how many times the lower court used the wrong term, but rather whether use of that term implies that the court used the wrong standard.

13

In this case, the lower court's use of the term in finding no prima facie case on the first motion clearly does not amount to an unreasonable application of federal law because the court later did find a prima facie case and did require the prosecutor to present a credible race-neutral reason for the strike, as required by Batson. The California Court of Appeal's explanation of the use of the term on the second motion does not represent an objectively unreasonable determination of the facts or an objectively unreasonable application of federal law. See 28 U.S.C. § 2254(d). Though the lower court used the wrong term, it did not rely on that reasoning in denying the motion, but rather found that the prosecutor presented a credible, race-neutral explanation. Finally, on the fourth motion the court again used the wrong term, but also once again looked to the existence of race-neutral reasons for excusing the juror in finding that the petitioner had not made a prima facie case. This Court is satisfied that despite the state trial court's use of the term "systematic exclusion," there is no indication that the trial court actually applied an incorrect standard. The California Court of Appeal's conclusion to this effect certainly cannot be considered objectively unreasonable. See id.

> 2.     Defense argument

Petitioner claims that the state trial court erred by curtailing defense counsel's argument during the second and third motions. The California Court of Appeal rejected this claim, stating:

> On the second motion, the court specifically invited defense counsel Dinning to comment on the justifications, and he did so at length. The court did interrupt toward the start, when Dinning explained how he "attempted to be extremely secretive regarding the making of these motions," but the court correctly called that irrelevant and asked him to respond to the justifications, "because that's where we are at this point"–implicitly meaning step three. Then Dinning went on for two and a half transcript pages about the justifications, interrupted only once, when he began reciting Mr. J.G.'s background. The court properly redirected counsel to the

14

justifications, noting that the prosecutor had not relied on anything in the juror's *responses* as justification for striking him, that the record would reflect those facts, and that the court was "just trying to cut right to the chase, and avoid wasting time" on other matters. Dinning finished without further interruption, and the court then invited codefendant's counsel to comment, letting him finish before ruling. No conceivable error appears.

On the third motion, the court did proceed to rule before considering defense argument. However, unlike the prior motion involving justifications for four jurors, this time the court already had all prior input and only the justifications for one new strike to consider. Also, again unlike the last time, the court had observed for itself all of the observations the prosecutor cited. The court thoroughly addressed them, agreeing in the end with the root concerns but explaining in detail that it attributed some of the juror's odder reactions and demeanor to a stuttering problem. When Dinning then asked if he would have "any chance at all to respond to the characterizations," the court explained at length its bases for ruling and said it did not believe defense counsel's comments would "change what I heard, what I saw, and . . . what's going through the district attorney's mind" (set out more fully in fn. 4, ante ). Nevertheless, the court did entertain remarks by Dinning and cut him off only when counsel focused on the circumstances of this being a third Wheeler motion and the fifth stricken Black juror. The court explained: "Counsel, wait, wait. I don't need that, because I know that. . . . I thought that what you wanted to respond to were what her actual comments were, and what you're arguing I don't need. I know all that. I know that's why you're making the motion, and your *outrage* is not going to change my ruling." (Italics added.) In spite of that elaborate explanation, Dinning offered nothing directed to the prosecutor's *comments*, and there is no reason to think that such argument would have been rejected if offered. Erroneous limitation of argument is not shown.

People v. Bullock, slip op. at 13-14. The California Court of Appeal's rejection of petitioner's claim was not contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent, nor was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

In determining the credibility of the prosecutor's race-neutral explanation, the court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. Mitleider v. Hall, 391 F.3d 1039,

15

1047 (9th Cir. 2004); <u>Lewis v. Lewis</u>, 321 F.3d 824, 831 (9th Cir. 2003).  In both motions at issue here, the trial court evaluated all *relevant* facts and curtailed defense counsel's arguments only when it was satisfied that his arguments would not have added anything new to the matter at hand.

On the second motion, defense counsel's arguments concerned Mr. J.G.'s qualifications as a juror, not the credibility of prosecutor's claim that he believed Mr. J.G. would not work well with other jurors.  At the third stage of a <u>Batson</u> claim, the juror's qualification are no longer relevant, since a prima facie case has already been made.  Likewise, on the third motion, defense counsel's arguments concerned the number of African-American jurors already removed, a fact relevant for making the prima facie case but less relevant in responding to the credibility of the prosecutor's justification.  The state appellate court reasonably concluded that the trial court only curtailed the defense counsel's arguments when it was clear that defense counsel had no relevant comment to add to the proceedings.  <u>See</u> 28 U.S.C. § 2254(d).  After all, nothing in the record suggests that the prosecutor's race-neutral justification for striking the jurors would have been rejected had defense counsel been allowed to argue further.

### 3. Evaluation of prosecutor's credibility

The California Court of Appeal rejected petitioner's claim that the court did not make a "sincere and reasoned" attempt to determine the legitimacy of the prosecutor's race neutral explanations and instead conflated steps two and three of the evaluation by simply accepting any plausible explanation.  The court explained:

> We do not read the record that way. Had the court simply accepted any plausible explanation, it would have had no need to find, as it did, that Ynostroza gave "an honest, good faith description of what she saw, I do accept that." If Bullock means to split hairs, saying that an honest, good faith observation might not necessarily be the one Ynostroza actually relied upon, then this, too, is

unsupported by the record. It is enough to consider these remarks limiting defense counsel's comments in ruling on the third motion: "The question for me is, do I believe that that's a good–that she's representing a good faith or actual reasons and are they supported–well, they don't have to necessarily be, but are they supported by either responses to questions or my own observations? And you can make all the arguments that you want, but I believe that they are, and I'm not–my job is not to decide whether this is a person that she should excuse. My job is simply to decide whether *her motivation for excusing* this man, or *any of the African-Americans*, and I heard her justification for the others, so I didn't need to inquire again: *Was it racially motivated? And I believe I accept her race-neutral explanation*, and I don't think comments by defense counsel are going to add or take away from that, because they don't change what I heard, what I saw, and they don't change *what's going through the district attorney's mind*." (Italics added; see fn. 4, ante.)

The record leaves no doubt that the trial judge separately undertook Batson's third analytical step, making " ' "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . ." [Citation.]' [Citation.]" (People v. Reynoso, supra, 31 Cal.4th at p. 919.) This is not a case like those Bullock cites, where a trial court stopped at declaring explanations to be plausible (U.S. v. Alanis (9th Cir.2003) 335 F.3d 965, 968-969), asked no questions when offered reasons were suspiciously inconsistent with the record (People v. Silva (2001) 25 Cal.4th 345, 385-386), or accepted reasons that were so vague as to afford no meaningful basis for the ruling (People v. Allen (2004) 115 Cal.App.4th 542, 546, 551, 553).

Bullock attacks demeanor-based justifications as disputed by defense counsel or uncorroborated, but we must give the trial court's findings great deference, as turning largely on evaluations of credibility (People v. Reynoso, supra, 31 Cal.4th at p. 918, 924), and we cannot second-guess them. Defense counsel disputed some of the prosecutor's interpretations, but the court accepted them as genuine and honest, having observed most for itself, and generally agreed with the prosecutor. The court's duty was to ask: "[W]as the reason given . . . a 'legitimate reason,' legitimate in the sense that it would not deny defendants equal protection of law [citation], or was it a disingenuous reason for a peremptory challenge that was in actuality exercised solely on grounds of group bias?" (Id. at p. 925.) The court resolved that question by properly focusing "on the subjective *genuineness* of the race-neutral reasons given . . ., *not* on the objective *reasonableness* of those reasons," (id. at p. 924) or whether other attorneys may have reasonably differed over what conclusions to draw from what was seen (ibid.).

17

1    People v. Bullock, slip op. at 11-13 (footnote omitted).

2        The California Court of Appeal's rejection of petitioner's claim was not

3    contrary to, nor involved an unreasonable application of, clearly established

4    Supreme Court precedent, nor was based on an unreasonable determination of the

5    facts.  See 28 U.S.C. § 2254(d).  The court of appeal's assessment of the trial

6    court rulings was reasonable.  The record shows that the trial court did not simply

7    accept the prosecutor's proffered race-neutral reasons at face value.

8        On the first motion, the trial court initially found that petitioner had not

9    made a prima facie case of discrimination in either of the prosecutor's two strikes

10   that were challenged.  The court explained why the prosecutor's strikes did not

11   raise an inference of discrimination.  According to the court, the first juror

12   removed, Mr. K.F., "had some serious misgivings about the judicial systems as a

13   whole," and "wasn't being entirely forthright in his feelings."  Most importantly,

14   the court "took particular note of his attitude about attorneys."  People v. Bullock,

15   slip op. at 2.  The second juror, Ms. S.G., "was dripping with attitude."  Id. at 5.

16   After the second motion, the court found a prima facie case as to the first motion

17   and required the prosecutor to explain the two strikes.  The prosecutor reinforced

18   the court's observations, saying that Mr. K.F. didn't like attorneys and was not

19   forthcoming with information, and that Ms. S.G. appeared hostile.  The court

20   agreed with these observations.  As to the first motion, it was not objectively

21   unreasonable for the trial court to credit the prosecutor's race neutral explanation

22   for the Batson challenge.  See Rice v. Collins, 126 S. Ct. 969, 974 (2006).  Now

23   was it objectively unreasonable for the state appellate court to accept the trial

24   court's findings.  See 28 U.S.C. § 2254(d).

25       On the second motion, the trial court found a prima facie case of

26   discrimination and required the prosecutor to explain the strikes.  The prosecutor

27

28                                          18

explained that Ms. L.G. at first appeared to be a good candidate for the jury but had a change of attitude after she was denied a hardship excuse which made him doubt that "she would listen to the evidence, work with other jurors, or give the case the attention both sides needed." People v. Bullock, slip op. at 3.  The court shared this observation of Ms. L.G., and the fact that the prosecutor independently reached the same conclusion as the court bolstered the court's belief in the prosecutor's credibility.  The court relied on this credibility determination in part in accepting the prosecutor's explanation of the strike of Mr. J.G., which had "puzzled" the court.  The prosecutor stated that though Mr. J.G. appeared to be a qualified juror, he seemed disdainful of other jurors and "could be someone who would dig his heels in, and would not at least listen to other people's opinion. . . ." Id. at 4.  The court noted that it had not made the same observations but accepted the prosecutor's good faith representations in part based on the fact that the court shared the prosecutor's observations with regards to every other juror dismissed.  Although defense counsel argued that Mr. J.G. was a qualified juror, the court found that the statements did not bear on the credibility of the prosecutor's rationale and so disregarded them.  As to the strikes raised on the second motion, it was not objectively unreasonable for the trial court to credit the prosecutor's race neutral explanation for the Batson challenge. See Rice, 126 S. Ct. at 974.  Nor was it objectively unreasonable for the state appellate court to accept the trial court's findings. See 28 U.S.C. § 2254(d).

On the third motion, the trial court again found a prima facie case of discrimination and required the prosecutor to explain the strike.  The prosecutor explained that Mr. A.F. appeared to be unusually nervous and a "loner" which likely would make it difficult for him to interact with other jurors.  Importantly,

19

the prosecutor noted that she had earlier excused a white male juror for similar reasons.  People v. Bullock, slip op. at 6.  Although the court did not share some of the prosecutor's sentiments, it did agree with the general observations about Mr. A.F.'s demeanor and thus accepted the prosecutor's explanation.  The court disregarded defense counsel's arguments on the matter because the arguments would not "add or take away" from the courts acceptance of the prosecutor's race-neutral explanation.  Id. at 7.  As to the strike raised on the third motion, it was not objectively unreasonable for the trial court to credit the prosecutor's race neutral explanation for the Batson challenge.  See Rice, 126 S. Ct. at 974.  Nor was it objectively unreasonable for the state appellate court to accept the trial court's findings.  See 28 U.S.C. § 2254(d).

On the fourth motion, the trial court found that the petitioner had not made a prima facie case of discrimination in the challenged strike.  The court stated that it was "pretty obvious why any district would excuse Ms. E.L."  The court went on to explain that the juror "characterize[d] her son as being constantly harassed by the police because he's an African-American male," and that she "expressed a rather strong–although not absolute unwillingness to accept as true what police officers say."  People v. Bullock, slip op. at 8.  Additionally, Ms. E.L. had noted that one of the defendants looked like her son raising a concern of potential sympathy.  After the court denied the motion, neither defense counsel offered or asked to speak.  It was not objectively unreasonable for the trial court to conclude that no prima facie case of discrimination had been made for the Batson challenge.  See Rice, 126 S. Ct. at 974.  Nor was it objectively unreasonable for the state appellate court to accept the trial court's findings.  See 28 U.S.C. § 2254(d).

20

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is

DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: July 31, 2007

_____
CHARLES R. BREYER
United States District Judge

G:\CRBALL\2006\3548\Draft Order.wpd

21